# In the United States Court of Federal Claims

No. 18-1257
(Filed:  17 November 2020)

*****************************************

DAVID C. SHNIER & EVELYN Z. SHNIER,  *

            *

    Plaintiffs,     *

            *   *Pro Se*; Tax Refund Claim; RCFC 56;

v.            *   Motion for Summary Judgment; 26 I.R.C.

            *   § 1297; Passive Foreign Investment

   THE UNITED STATES,   *   Company ("PFIC"); Taxpayer Bill of

            *   Rights ("TBOR"); 26 I.R.C. § 7803(a)(3)

    Defendant,    *

            *

*****************************************

*David C. Shnier and Evelyn Z. Shnier*, *pro se*, of Baltimore, MD, for plaintiffs.

*Miranda Bureau*, Trial Attorney, with whom were *Mary M. Abate*, Assistant Chief, *David I. Pincus*, Chief, Court of Federal Claims Section, and *Richard E. Zuckerman*, Principal Deputy Assistant Attorney General, Department of Justice, all of Washington, D.C.

## OPINION AND ORDER

**HOLTE**, **Judge**.

  Plaintiffs David and Evelyn Shnier bring this case challenging an Internal Revenue Service ("IRS") assessment of passive foreign investment company ("PFIC") taxes under the Internal Revenue Code ("I.R.C.") § 1297 against plaintiffs' foreign holdings.  Pending before the Court are the government's motion for summary judgment and motion to dismiss, along with plaintiffs' cross-motion for summary judgment.  For the following reasons, the Court **GRANTS** the government's motion for summary judgment, **DENIES** plaintiffs' cross-motion for summary judgment, and **DISMISSES** plaintiffs' claims for injunctive relief and fees for lack of subject matter jurisdiction under RCFC 12(b)(1).

## I.  Factual and Procedural History[1]

### A.  Factual History

---

[1] In its motion for summary judgment pursuant to RCFC 56, the government also asserts "under RCFC 12(b)(l), the Court must dismiss for lack of jurisdiction" two of plaintiffs' claims for relief, rather than filing a separate motion to dismiss.  Def.'s Mot. for Summ. J. and Mem. in Supp. at 1, ECF No. 25.  The Court analyzes the relief requested accordingly.  In considering the parties' motions, the Court accepts as true the undisputed allegations from plaintiffs' complaint.  *See* Def.'s Mot. for Summ. J. and Mem. in Supp. at 1 n.1, ECF No. 25 ("For purposes of this motion only, defendant accepts as true the allegations that are cited and not disputed herein.").

In the 1960s, plaintiff David Shnier's "father and four uncles . . . established family trusts to share ownership of their jointly owned [Canadian] floorcovering company." Pls.' Cross-Mot. for Summ. J. and Opp'n to Def.'s Mot. for Summ. J. ("Pls.' Cross-MSJ") at 11, ECF No. 26; *see* Compl. at 2, ECF No. 1. After the Canada Revenue Agency issued regulatory changes making holding a corporation through trusts less advantageous, the five men created five holding companies—"one for each family"—through which they jointly owned the floorcovering company. *Id.* Mr. Shnier's father owned and managed one of these companies, Enshnierco. *See id.* A sixth holding company, Metropolitan Equities Limited, was created, and its "main assets were the buildings owned by the floorcovering company" and "the only bank account that has existed for these six holding companies . . . ." *Id.* "For income spreading purposes," the brothers' children and spouses were made "co-owners of the five family holding companies." *Id.* This led to the children "receiving" distributions from the flooring company, although no money was ever actually given to them. Pls.' Cross-MSJ at 11–12; *see* Compl. at 2. Rather, "their parents and [u]ncles were the actual recipients of the money." Pls.' Cross-MSJ at 12; *see* Compl. at 2.

Mr. Shnier immigrated to the United States from Canada in the mid-1990s. *See* Pls.' Cross-MSJ at 13; Compl. at 2. He became a naturalized citizen "during 2005–2007." Pls.' Cross-MSJ at 14; *see* Compl. at 4. In 2007, before the death of Mr. Shnier's father, "the floorcovering company was sold." Pls.' Cross-MSJ at 12; *see* Compl. at 2, 4. Mr. Shnier's father "made the decision on which investment management companies to use" when investing Enshnierco's portion of the proceeds from the sale, thereby transitioning the holding company's "main asset[s]" from the floorcovering corporation to passive investments, including real estate. *Id.*

Beginning in 2007 and continuing for several years, "including . . . 2010 and 2011," Mr. Shnier "received distributions" from the Canadian holding companies. Def.'s Mot. for Summ. J. and Mem. in Supp. ("Def.'s MSJ") at 2, ECF No. 25 (citing Compl. at 2, 10). Plaintiffs timely filed their U.S. federal income tax returns (Forms 1040) for the tax years 2007, 2010, and 2011. *Id.* (citing Compl. at 4). Despite receiving advice in 2007 from a Canadian accounting firm they "could be subject to U.S. tax reporting laws [such as 26 I.R.C. § 1297] with respect to those holding companies," plaintiffs did not report the distributions on their federal tax returns. *Id.* In late 2013, however, Mr. Shnier filed amended 2007, 2010, and 2011 tax returns while participating in the IRS's Offshore Voluntary Disclosure Program ("OVDP"). *Id.* at 3 (citing Compl. at 5–6). OVDP is one of several IRS "initiatives to encourage taxpayers in plaintiffs' situation to come forward voluntarily," pay their taxes and fees, and address issues creating possible "criminal and civil liability due to failure to report foreign assets or transactions." *Id.* Plaintiffs' amended returns included "the distributions from the Canadian holding company Metropolitan Equities Limited as income from a passive foreign investment corporation." *Id.* (citing App., Ex. 1 at A035; Ex. 2 at A101; Ex. 3 at A130 (Plaintiffs' Amended Tax Returns, 2007, 2010, and 2011)). On 12 June 2014, the IRS informed plaintiffs' attorney at the time the agency had "preliminarily accepted" the voluntary disclosure. Def.'s MSJ at 4 (citing App., Ex. 16 (Letter from Frank S. Turner II, Director, International Strategy and Planning, IRS to Saul B. Abrams, Attorney for David and Evelyn Shnier (June 12, 2014))). More than one year later, on 16 July 2015, plaintiffs sent a letter to the IRS opting out of OVDP and "requesting that the case

be 'closed.'" *Id.* (quoting App., Ex. 10 (Letter from Jeffrey D. Baer, CPA, to Richard Vollmer, IRS (July 16, 2015))). The IRS continued to offer plaintiffs the opportunity to participate in OVDP while at the same time warning it might audit plaintiffs "under standard examination procedures" should they continue not to comply. *Id.* (quoting App., Ex. 11 at A180 (Letter from Kimberly Nguyen, Internal Revenue Agent, IRS, to David C. and Evelyn Z. Shnier (August 11, 2016))).

On 4 April 2017, plaintiffs sent the IRS a letter "requesting appeal of the penalties assessed under § 6662." *Id.* at 5 (citing App., Ex. 8 (Letter from David C. and Evelyn Z. Shnier to Kimberly Nguyen, Internal Revenue Agent, IRS (April 4, 2017))). On 28 April 2017, the IRS assessed PFIC taxes against plaintiffs, leading to payments of additional taxes, interest, and I.R.C. § 6662 penalties totaling $49,949.12, $12,115.69, and $5,228.21 for 2007, 2010, and 2011, respectively. *Id.* at 4–6 (citing App., Ex. 4 at A159; Ex. 5 at A164; Ex. 6 at A169 (Plaintiffs' Form 4340, Certificate of Assessments and Payments, 2007, 2010, and 2011)). Eight months later, on 28 December 2017, the IRS received a second letter from plaintiffs protesting the PFIC income tax assessments. *Id.* at 6 (citing App., Ex. 9 (Letter from David C. and Evelyn Z. Shnier to Kimberly Nguyen, Internal Revenue Agent, IRS (December 26, 2017))). The IRS "treated these letters as informal refund claims" and refunded plaintiffs' § 6662 penalties as such. Def.'s MSJ at 6 (citing Compl. at 6). At the same time, the IRS rejected the tax assessment protest. *Id.* (citing Compl. at 6). Plaintiffs appealed the IRS's decisions through its procedures, which "concluded in May 2018." Compl. at 2 ("According to the IRS Appeals decision letter '1363' dated May 15, 2018, we can contend the decisions in the United States Court of Federal Claims."). Plaintiffs explain their IRS appeals "were a result of [Mr. Shnier's] participation in the IRS Offshore Voluntary Disclosure Program (OVDP) and beyond . . . ." *Id.*

## B. Procedural History

Following the failure of their tax assessment protest, plaintiffs filed a complaint in this Court on 21 August 2018 to recover their PFIC income taxes paid for 2007, 2010, and 2011. *See id.* at 5. Plaintiffs argued "the IRS has miss-applied [sic] the laws of" PFICs to their ownership of Canadian companies. *Id.* at 2. Plaintiffs requested $99,706 in "back taxes, penalties, and interest which were not refunded through our IRS Appeals claim." *Id.* Plaintiffs also sought equitable relief consisting of "50-percent of the legal and accounting fees, which have been incurred to date through our efforts to report these Canadian ancestral holdings as PFIC's [sic]," along with injunctive relief "order[ing] the IRS . . . desist from classifying as PFICs" their companies. *Id.* On 26 February 2019, the government answered, "[d]en[ying] that the IRS has misapplied any laws." Answer at 2, ECF No. 12. The case was reassigned to the undersigned Judge on 29 July 2019. *See* Order, ECF No. 16.

On 30 August 2019, the parties filed a Joint Status Report ("JSR"), which included a separate statement from plaintiffs reporting a timeline of recent "activities and results." JSR, ECF No. 18. Plaintiffs' timeline included discovery-related events and stated plaintiffs offered a settlement proposal to the government, which the government rejected on 23 August 2019. *Id.* at 3. Plaintiffs subsequently moved for alternative dispute resolution ("ADR") on 3 September 2019. *See* Mot. for Alternative Dispute Resolution, ECF No. 19. The government consented to ADR on 17 September 2020. *See* Def.'s Resp. to Pls.' Req. for Alternative Dispute Resolution,

ECF No. 20.  The ADR proceeding was referred to Senior Judge John P. Wiese on 3 October 2019.  Order, ECF No. 21.  On 31 October 2019, the court held an unrecorded ADR proceeding, and it concluded ADR on the following day, 1 November 2019.  Order Terminating ADR Proceedings, ECF No. 23 ("Based on a discussion with the parties, it has been determined that further ADR proceedings in this case would not be appropriate.").

On 9 December 2019, the government filed a motion for summary judgment.  *See* Def.'s MSJ.  In response, plaintiffs filed a cross-motion for summary judgment on 3 January 2020.  *See* Pls.' Cross-MSJ.  On 31 January 2020, the government filed a response.  *See* Resp. to Pls.' Cross-Mot. for Summ. J. ("Def.'s Resp."), ECF No. 27.  On 13 February 2020, the government filed a motion to amend its response.  *See* Def.'s Mot. for Leave to File an Amended Resp. to Pls.' Cross-Mot. for Summ. J. ("Def.'s Amended Resp."), ECF No. 28.  Plaintiffs filed their reply on 14 February 2020.  *See* Pls.' Resp. to Def.'s Resp. to Pls.' Cross-Mot. for Summ. J. and Continued Opp'n to Def.'s Mot. for Summ. J. ("Pls.' Reply"), ECF No. 29.

On 7 April 2020, the Court held a telephonic status conference to discuss whether plaintiffs would like the Court to refer their case to the Court's Bar Association Pro Bono/Attorney Referral Pilot Program.  *See* Status Conference Tr., ECF No. 36.  The parties agreed "there's no possibility of resolution through ADR . . . ."  *Id.* at 5:7–8.  The Court inquired as to whether plaintiffs would like to participate in the Court's pro bono representation program, and plaintiffs replied they were open to representation, but not by a tax attorney.  *Id.* at 5:24–7:16 (Mr. Shnier noted plaintiffs could be represented by "perhaps a human rights lawyer, . . . most tax lawyers are surely not wanting to take this.").  Later in the status conference, plaintiffs agreed to referral.  *Id.* at 13:5–6.  The Court issued the pro bono referral and stayed the case on the same day, 7 April 2020.  Order, ECF No. 32.  On 15 June 2020, plaintiffs filed a status report noting during the 60-day stay following the Court's referral, "neither an attorney, nor the Court's Bar Association, have contacted the Plaintiffs regarding" their case.  Pls.' Status Report Following April 7th, 2020 Court Ordered 60 Day Stay, ECF No. 38.  The Court held oral argument on 12 August 2020.  *See* Oral Argument ("OA") Tr., ECF No. 41.  After plaintiffs' initial calculations requested a higher amount, now "[p]laintiffs agree with the corrected alleged PFIC related amount of $15,556 as reported by the Defendant on page seven of their [MSJ]."  Pls.' Cross-MSJ at 17; *see* Def.'s MSJ at 6–7 ("[T]he total tax for all three years that is potentially recoverable by plaintiffs in this suit is $15,556, *not* the $42,170 that they allege in the complaint (at 5)").

## II.  Applicable Law

### A.  Jurisdiction

The Court of Federal Claims has limited authority to entertain suits against the United States, and the federal government's waiver of sovereign immunity "may not be inferred, but must be 'unequivocally expressed.'"  *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003).  The Tucker Act grants this Court jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  "The Tucker Act . . . is itself only a jurisdictional statute; it does not create any substantive right

enforceable against the United States for money damages. . . . [T]he Act merely confers jurisdiction upon it whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976).  Plaintiffs "bear[] the burden of establishing subject matter jurisdiction by a preponderance of the evidence." *Reynolds v. Army and Air Force Exchange Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).  "If the court finds that it lacks jurisdiction over the subject matter, it must dismiss the claim."  *Matthews v. United States*, 72 Fed. Cl. 274, 278 (2006).

The Court's jurisdiction in tax disputes is generally limited to tax refund suits.  *See* 28 U.S.C. § 1346(a)(1) (granting the Court of Federal Claims concurrent jurisdiction with federal district courts over "[a]ny civil action against the United States for the recovery of . . . any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws").  In such tax suits, the Court's jurisdiction is limited to those situations where the taxpayer has complied with the relevant provisions of the I.R.C.  *See United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 4 (2008) ("The Internal Revenue Code specifies that before [filing in the Court of Federal Claims], the taxpayer must comply with the tax refund scheme established in the Code.").  To meet the Court's jurisdictional requirements in a tax refund suit, a plaintiff must:  (1) satisfy the full payment rule; (2) timely file a tax refund claim with the IRS; and (3) "provide the amount, date, and place of each payment to be refunded," along with "a copy of the refund claim."  *Fry v. United* States, 72 Fed. Cl. 500, 510 (2006).  The "full payment rule" requires taxpayers to fully pay their federal income tax at issue prior to filing suit in the Court.  *Id.*  "The *Flora* full payment rule requires that taxpayers prepay the tax principal before the Court of Federal Claims will have subject matter jurisdiction over their tax refund action under § 1491."  *Shore v. United States*, 9 F.3d 1524, 1527 (Fed. Cir. 1993); *see Flora v. United States*, 362 U.S. 145, 150 (1960).

With respect to claims against the United States for the refund of any "tax," "penalty," or "sum," 26 I.R.C. § 7422 provides:

> No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

26 I.R.C. § 7422(a).  This statute conditions a refund action on the filing of an administrative claim for refund after the liability is paid.  *See McNeil v. United States,* 293 F. App'x 758, 760 (Fed. Cir. 2008); *Skillo v. United States,* 68 Fed. Cl. 734, 741 (2005).  After a taxpayer fully pays his liability and files a claim for refund, he has two years from the date of mailing of a notice of disallowance to bring a suit or proceeding under § 7422(a).

Under the Tucker Act, this Court may not generally grant injunctive or declaratory relief. *Richardson v. Morris,* 409 U.S. 464, 465 (1973).  Moreover, this Court, with limited exceptions, does not have jurisdiction to grant nonmonetary relief and does not generally have authority to issue declaratory judgments.  *United States v. King,* 395 U.S. 1, 5 (1969).  Furthermore, the Anti-

Injunction Act provides "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person . . . ." 26 I.R.C. § 7421(a); *see, e.g.*, *Ledford v. United States,* 297 F.3d 1378, 1381 (Fed. Cir. 2002) (holding the Anti-Injunction Act "flatly prohibits" the grant of injunctive relief regarding IRS collection proceedings).

## B. Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). This Court's interpretation of the RCFC is "guided by case law" interpreting the Federal Rules of Civil Procedure. 2002 Rules Committee Note, Rules of the United States Court of Federal Claims (as amended August 3, 2020). For a court to grant summary judgment, the moving party must "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## C. The Internal Revenue Code

In general, the fundamental issue in a tax refund suit is whether the taxpayer can establish he has overpaid his taxes for the years in suit. *See Lewis v. Reynolds,* 284 U.S. 281, 283 (1932); *Dysart, v. United States,* 169 Ct. Cl. 276, 283 (1965). "In tax refund suits, factual issues are tried *de novo* in this court, with no weight given to subsidiary factual findings made by the Service in its internal administrative proceedings." *Cook v. United States,* 46 Fed. Cl. 110, 113 (2000) (internal citations omitted). The IRS's assessment, however, "is presumed to be correct and this places an obligation on the taxpayer to come forward with evidence to rebut the presumption." *Id.* (citing *United States v. Janis,* 428 U.S. 433, 440–41 (1976)). Taxpayers bear the burden of demonstrating their entitlement to a refund and must also establish the exact dollar amount of any proposed refund. *Janis,* 428 U.S. at 440–41; *WMI Holdings Corp. v. United States,* 891 F.3d 1016, 1021–22 (Fed. Cir. 2018).

Sections 1291 through 1297 of the tax code detail the rules for passive foreign investment companies. *See* 26 I.R.C. §§ 1291–1297. Section 1297 defines a PFIC as follows:

(a) In general– For purposes of this part, except as otherwise provided in this subpart, the term "passive foreign investment company" means any foreign corporation if—

(1) 75 percent or more of the gross income of such corporation for the taxable year is passive income, or

(2) The average percentage of assets (as determined in accordance with subsection (e)) held by such corporation during the taxable years which produce

passive income or which are held for the production of passive income is at least 50 percent.

26 I.R.C. § 1297(a).  The tax code defines "passive income" as "any income which is of a kind which would be foreign personal holding company income in in section 954(c)."  26 I.R.C. § 1297(b).  The definition of "foreign personal holding company income" in § 954(c)(1) includes, among other things, "the portion of gross income which consists of . . . [d]ividends, interest, royalties, rents, and annuities."  26 I.R.C. § 954(c)(1).  Section 1291 of the tax code stipulates excess distributions from a PFIC or a net gain from the sale of PFIC stock are to be taxed unless the taxpayer makes an election to treat the PFIC as a qualified electing fund under §§ 1293–1295 or makes an election under § 1296.  26 I.R.C. § 1291.  An excess distribution is defined as "any distribution in respect of stock received during any taxable year to the extent such distribution does not exceed its ratable portion of the total excess distribution (if any) for such taxable year."  26 I.R.C. § 1291(b)(1).

In 2015, Congress enacted a Taxpayer Bill of Rights ("TBOR"),[2] which states "the Commissioner shall ensure that employees of the Internal Revenue Service are familiar with and act in accord with taxpayer rights as afforded by other provisions of this title," and then provides a list of ten rights.  26 I.R.C. § 7803(a)(3).  Another judge on this court recently held "[i]t is plaintiff's burden to establish jurisdiction for his claims founded on the Taxpayer Bill of Rights, but he has not shown that the ten rights listed at I.R.C. § 7803(a)(3) are money-mandating so as support this court's jurisdiction under the Tucker Act."  *Yates v. United States*, No. 20-169T, 2020 WL 5587366, at *6 (Fed. Cl. Sept. 18, 2020) (Sweeney, J.).  The court in *Yates* noted the TBOR protects "taxpayer rights *as afforded by other provisions of this title*."  *Id.* (emphasis in original); *see Facebook, Inc. v. IRS*, No. 17-CV-06490, 2018 WL 2215743, at *13 (N.D. Cal. May 14, 2018)) (holding the ten rights listed in the TOBR create no new enforceable rights against the IRS).

The United States Tax Court in *Moya v. Comm'r* similarly held the TBOR exists "not [to] . . . create new rights *or remedies*, only to group existing rights into categories that are easier for taxpayers and IRS employees to understand and remember.  Thus, a TBOR does not create new rights, but provides organizing principles—a framework—for statutory rights."  152 T.C. 182, 196 (2019) (emphasis in original) (internal citations omitted).  When the TBOR was released, it "encompass[ed] 'multiple existing rights embedded in the tax code' and [as IRS Commissioner John A. Koskinen explained,] '[w]hile these rights have always been there for taxpayers, we think the time is right to highlight and showcase these rights for people to plainly see.'"  *Id.* (quoting IR-2014-72, 2014 WL 2590817).  The United States Tax Court held "the Commissioner had no power to legislate any new rights," leading it to "conclude that, in adopting its TBOR in 2014, the IRS did not create for taxpayers any rights or remedies that they did not theretofore enjoy."  *Id.* at 197.  "While decisions of the Tax Court are not binding," judges on this court and its predecessor "follow these decisions if the underlying rationale is persuasive."  *Buser v. United*

---

[2] A different part of the tax code, 26 I.R.C. § 7433, is also popularly called the Taxpayer Bill of Rights.  *See Kim v. United States*, 632 F.3d 713, 715 n.1 (D.C. Cir. 2011).  Some states, including Colorado, also have a "Taxpayer's Bill of Rights."  *See, e.g.*, *Kerr v. Hickenlooper*, 824 F.3d 1207 (10th Cir. 2016) (discussing the state's Taxpayer's Bill of Rights ("TABOR")).

*States*, 85 Fed. Cl. 248, 264 n.16 (2009); *see Dobson v. C.I.R.*, 320 U.S. 489, 502 (1943) ("The Tax Court is informed by experience and kept current with tax evolution and needs by the volume and variety of its work . . . [and] uniform administration would be promoted by conforming to [its decisions] when possible."); *Amergen Energy Co., LLC ex rel. Exelon Generation Co., LLC v. United States*, 94 Fed. Cl. 413, 422 (2010) (examining a Tax Court case for its persuasive value); *Southland Royalty Co. v. United States*, 22 Cl. Ct. 525, 530 n.15 (1991) (discussing the Tax Court's persuasive authority as it relates to United States Claims Court, the direct predecessor of the Court of Federal Claims).

The tax code allows taxpayers to "take[] the position that a treaty of the United States overrules (or otherwise modifies) an internal revenue law of the United States."  26 I.R.C. § 6114(a).  In such a circumstance, the taxpayer "shall disclose (in such manner as the Secretary may prescribe) such position" (1) on the tax return or (2) if no tax return must be filed, in another form the Secretary may prescribe.  26 I.R.C. § 6114(a)(1)–(2).  The United States and Canada are parties to the Convention Between the United States of America and Canada with Respect to Taxes on Income and Capital, Sept. 26, 1980, U.S.–Can., T.I.A.S. No. 11,087.

Administrative and litigation costs in tax cases are governed according to 26 I.R.C. § 7430.  Under this provision, the "prevailing party" may be awarded reasonable administrative and litigation costs so long as the following limitations are satisfied:  (1) all administrative remedies must be exhausted; and (2) the party must not have unreasonably protracted administrative or judicial proceedings.  26 I.R.C. § 7430 (a)–(b).  A prevailing party is further defined as having (1) substantially prevailed with respect to the amount in controversy; or (2) substantially prevailed with respect to the most significant issue or set of issues presented.  26 I.R.C. § 7430 (c)(4)(A).

### D.  Statutory Interpretation

"To ascertain whether Congress had an intention on the precise question at issue, we employ the 'traditional tools of statutory construction.'"  *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998).  Accordingly, courts "resist reading words or elements into a statute that do not appear on its face."  *Bates v. United States*, 522 U.S. 23, 29 (1997); *see Cox v. West*, 149 F.3d 1360, 1363 (Fed. Cir. 1998) (quoting *Freytag v. Comm'r*, 501 U.S. 868, 873 (1991)) ("[W]hen [a court finds] the terms of a statute unambiguous, judicial inquiry should be complete except in rare and exceptional circumstances.").  The Supreme Court has held "the starting point for interpreting a statute is the language of the statute itself.  Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive."  *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108 (1980).  While the Court may look to context to understand the meaning of a statute, it does not look beyond "the language and design of the statute as a whole."  *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988).

The Supreme Court has held if the language of the statute is "unambiguous, judicial inquiry is complete, except 'in "rare and exceptional circumstances."'"  *Rubin v. United States*, 449 U.S. 424, 430 (1981) (quoting *TVA v. Hill*, 437 U.S. 153, 187, n.33 (1978)).  "[The statute's]

language is plain and unambiguous.  What [one party] asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope.  To supply omissions transcends the judicial function." *W. Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101 (1991).  The Supreme Court has also "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).  This means courts "are not at liberty to create an exception where Congress has declined to do so." *Freytag,* 501 U.S. at 874.  The "possible existence of a few outlier instances does not prove [an] interpretation is absurd.  Congress may well have accepted such anomalies as the price of a uniform system of federal procedure." *Shady Grove Orthopedic Assoc. v. Allstate Ins. Co.*, 559 U.S. 393, 414 n.13 (2010).

### E.  *Pro Se* Litigants

Courts grant *pro se* parties greater leeway than litigants represented by counsel.  *See Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (holding *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers").  This court further recognizes "[w]hile a court should be receptive to *pro se* plaintiffs and assist them, justice is ill-served when a jurist crosses the line from finder of fact to advocate." *Demes v. United States*, 52 Fed. Cl. 365, 369 (2002).  Accordingly, the Court may excuse certain ambiguities in plaintiffs' complaint, but it "does not excuse its failures, if such there be." *See Henke v. United States*, 60 F.3d 795, 799 (Fed. Cir. 1995).  In addition, this court has long recognized "the leniency afforded to a *pro se* litigant with respect to mere formalities does not relieve the burden to meet jurisdictional requirements." *Minehan v. United States*, 75 Fed. Cl. 249, 253 (2007).  The *pro se* plaintiff— like any other plaintiff—must establish the Court's jurisdiction to consider a claim.  *Riles v. United States*, 93 Fed. Cl. 163, 165 (2010).

## III.  Parties' Arguments Regarding Motion for Summary Judgment

### A.  The Application of § 1297 to Plaintiffs

At oral argument, the Court asked whether "both parties are in agreement that Enshnierco as well as Metropolitan Equities Limited are PFICs as defined in Section 1297," to which Mr. Shnier replied "[y]es." OA Tr. at 23:13–23:17.  Plaintiffs also conceded this would mean they are subject to taxation under 26 I.R.C. §§ 1291–1297. *Id.* at 21:6–22:11 (After the Court asked whether plaintiffs "agree that the statute does require PFIC income to be subject to taxation," Mr. Shnier replied "I guess I have to agree that those are required . . . .").  Plaintiffs argued, however, the Court should read the text of the statute in its proper context and find their companies to not be PFICs and thus not subject to PFIC taxation. *Id.* at 22:25–23:12.  Plaintiffs argue both:  (1) the text, when read in context, supports their position; and (2) the Court should look beyond the text to legislative intent.  *See* Pls.' Cross-MSJ at 6 ("The Plaintiffs argue that applying the regime *outside its context* as described in Publication JCS-10-87 and the June 25, 2015 Congressional Record, is *contrary to the will* of Congress . . . .") (emphasis added).  The Court will treat these as primary and alternative arguments.

### 1.  Interpreting § 1297 in Context

Plaintiffs argue they "have never agreed that Enshnierco and everything it owns meet the statutory requirements for a PFIC, because the Plaintiffs contend that context must be factored into the interpretation of the statute." Pls.' Cross-MSJ at 5. According to plaintiffs, the plain meaning of § 1297 is narrower in context than a strict application of the text. OA Tr. at 53:9–15 (Mr. Shnier: "[T]here are many laws where . . . we do not take it out of its context in interpreting it."). Plaintiffs argue a publication from the Joint Committee on Taxation ("JCT"), JCS-10-87, provides "clearly defined context" outside which § 1297 "cannot be applied." Pls.' Cross-MSJ at 2.[3] According to plaintiffs, the context demonstrates "the PFIC regime was created to discourage American investors to hold passive investments through foreign corporations that would allow them certain advantages," so the statute includes a willfulness requirement, which plaintiffs fall outside of. *Id.*[4] Plaintiffs argue the PFIC regime is "punitive" because it "was intended to dissuade US investors from investing offshore" but "it is an aberration of justice to apply the punitive PFIC regime" to them because their PFIC status was non-willful. Pls.' Cross-MSJ at 6, 10. Plaintiffs further assert the government's application of PFIC regime to people like them is so disruptive it "has caused thousands of Americans to renounce their citizenship." OA Tr. at 10:10–12. According to plaintiffs, PFIC taxes should not apply to "situations like ourself [sic]," where immigrants happen to own passive offshore investments "not funded by one cent of American money"; rather, the taxes should apply only "to Americans who funded these companies with American-sourced money." *Id.* at 23:2–12.

The government notes "[p]laintiffs do not dispute that the Canadian companies met the statutory requirements for a passive foreign investment corporation. Nor do they dispute that the distributions they received were passive income." Def.'s MSJ at 11. It argues the "plain language of the relevant statutory provisions contains no element of willfulness." *Id.* at 12. The government maintains plaintiffs failed to show "[t]he definition of a PFIC . . . include[s] any description of intent by the shareholder." Def.'s Amended Resp. at 3. The government argues plaintiffs therefore have not met their "burden to demonstrate that they are entitled to a refund." Def.'s MSJ at 9. The government argues, therefore, "because plaintiffs have failed to show that

---

[3] The report states:

> Congress did not believe that tax rules should effectively operate to provide U.S. investors tax incentives to make investments outside the United States rather than inside the United States. Since current taxation generally is required for passive investments in the United States, Congress did not believe that U.S. persons who invest in passive assets should avoid the economic equivalent of current taxation merely because they invest in those assets indirectly through a foreign corporation.

Pls.' Cross-MSJ at 2 (quoting JCS-10-87 at 1023).

[4] Plaintiffs explain "[s]ections 1291 through 1297 of the Tax Reform Act of 1986" should not apply to "non-willful, encumbered, minority-interest, non-signatory, pre-existing immigrant holdings held in weaker currency non-tax-haven countries," particularly when these countries are the immigrants' place of origin and when these passive investments "have never been directly or indirectly funded by US sourced monies." Pls.' Cross-MSJ at 2. Plaintiffs further explain because "Mr. Shnier's Canadian father . . . made the decision on which investment management companies to use to manage and invest the funds," Mr. Shnier did not choose to transition Enshnierco into "a company that mainly possessed passive assets" and so should not be taxed under § 1297 for the distributions resulting from these investments. *Id.* at 12.

they are entitled to a refund, this Court should deny plaintiffs' cross-motion for summary judgment and grant judgment in favor of the United States." Def.'s Amended Resp. at 2.

### 2. Whether to Use Legislative History to Determine Congress's Intent Regarding § 1297

Plaintiffs also argue interpreting § 1297 to lack a willfulness requirement "is contrary to the will of Congress . . . ." Pls.' Cross-MSJ at 6. According to plaintiffs, Congress did not intend "to discriminate against immigrants and permanent residents." *Id.* Plaintiffs argue JCS-10-87 is "a *primary historical document* that provides *testimonial evidence* to the Congressional will, intent, and context of the PFIC regime as overseen by its creators" because it was published by the Joint Committee on Taxation. *Id.* at 7. Congress's intent, according to plaintiffs, "was to remove tax deferral advantages associated with certain types of *willfully enacted* foreign investments." Pls.' Reply at 3 (emphasis in original).

The government contends plaintiffs' quotation from JCS-10-87 "says nothing about willful intent nor does it imply that, under the statute, inherited interests in passive foreign investment corporations should be treated differently." Def.'s MSJ at 12–13. The government argues JCS-10-87 instead "suggests that since current taxation is generally required for passive investments in the United States, Congress wanted to ensure equivalent treatment for investments outside of the United States." *Id.* at 13. The government also observes neither the report's definition of "passive foreign investment company" nor the "exceptions to passive income" section "discuss[es] or even allude[s] to the concept of 'willful intent.'" *Id.* (citing JCS-10-87 at 1024–25). The government also argues this publication "is not legislative history" because it "is a staff-written document that was not prepared by a standing legislative committee." *Id.* at 12.

### 3. The Taxpayer Bill of Rights as an Exception to § 1297

Plaintiffs argue the TBOR provides substantive rights against which the tax code must be interpreted, including the right to be informed of American tax laws, the right to quality service for tax-related questions by nonprofessionals, the right not to be discriminated against, and the right to a fair and just tax system. Pls.' Cross-MSJ at 13–16; Compl. at 4. Plaintiffs also argue applying the PFIC regime to them discriminates against them based on their national origin because had plaintiffs' "legacy been American and not Canadian, [their] tax treatment would have been much simpler and less harsh." Pls.' Cross-MSJ at 15.

#### i. The Right to Be Informed

Plaintiffs argue their "right to be informed" was violated because they did not know about the PFIC laws until an accounting firm alerted them. *Id.* at 14. The government explains the right to be informed "refers to the content of specific communications from the IRS . . . [a]nd neither the IRS nor any other United States agency is required to inform an individual of every possible tax situation that might apply to him when he immigrates to the United States." Def.'s Amended Resp. at 7.

### ii. The Right to Quality Service

Plaintiffs argue their "right for quality service" was violated because "[t]here is no specialized telephone help line" for compliance questions. Pls.' Cross-MSJ at 14. The government responds any perceived unfairness from lack of assistance navigating the tax code does not "give[] plaintiffs a cause of action in this Court." Def.'s Amended Resp. at 7.

### iii. The Right to Not Be Discriminated Against

Plaintiffs also contend applying the PFIC laws to "pre-existing non-willful foreign passive assets that have not been funded directly or indirectly by US sourced monies" violates their "right not to be discriminated against" because had they "been American[s investing in] . . . an American company . . . the taxation rules would have been less harsh, non-punitive, and easier to comply" with. Pls.' Cross-MSJ at 15. The government observes "[t]he PFIC statute is designed to ensure that a U.S. taxpayer reports passive income from foreign corporations" and applies generally to all U.S. taxpayers who qualify. Def.'s Amended Resp. at 7.

### iv. The Right to a Fair and Just Tax System

Plaintiffs note their "right to a fair and just tax system" was violated because "it [is] extremely unfair and unjust that the punitive, complex, and expensive to comply [with] PFIC tax laws which were created for an entirely different target and purpose, would be applied" to them. Pls.' Cross-MSJ at 16. The government responds the TBOR "does not add any substantive rights to those allowed to a taxpayer under statute." Def.'s Amended Resp. at 6.

### B. Defining Plaintiffs' Companies as Normal Foreign Corporations

Plaintiffs "want the Court to rule" the government must "desist from treating Enshnierco and everything it owns, as a PFIC" and instead tax the distribution income as if it were from "a normal foreign corporation." Pls.' Reply at 6; Pls.' Cross-MSJ at 17. The government responds "plaintiffs' request that this Court order the IRS to desist from classifying certain companies as PFICs," goes beyond the jurisdiction of this Court because "to the extent that the plaintiffs are seeking an injunction or a declaratory judgment, this Court has no power to grant that request." Def.'s MSJ at 15–16. The government explains this means "under RCFC 12(b)(1), the Court must dismiss for lack of jurisdiction plaintiffs' request . . . ." *Id.* at 1.

### C. Application of Tax Treaties Between the United States and Canada

Plaintiffs also state the IRS has "arguably[] violated tax-treaties between Canada and the United States . . . ." Compl. at 2. The government explains "[u]nder § 6114, in order to take the position that a treaty of the United States overrules or modifies an internal revenue law of the United States, a taxpayer must disclose the treaty-based position on a tax return or statement attached to a tax return." Def.'s MSJ at 14 (citing 26 I.R.C. § 6114(a)(1)). The government then notes "plaintiffs have not clearly identified any conflict between the [relevant American–Canadian tax treaty] and the PFIC provisions of the Code," but "[e]ven if they had, however, the plaintiffs did not disclose a treaty-based return position on their tax returns, as required by I.R.C.

§ 6114." *Id.* The government argues this means "plaintiffs cannot now contend that they do not owe the tax they reported based on the Treaty." *Id.*

### D.  Plaintiffs' Request for Fees

Plaintiffs request the Court "reward [them] for half the[ir] legal and/or accounting fees ($57,536) . . . [because] reporting a PFIC is time consuming and expensive." Pls.' Cross-MSJ at 17.  The government contends "this Court has no jurisdiction over the plaintiff's [sic] request for 50 percent of accounting and legal expenses, because the plaintiffs do not identify any money mandating statute that would provide this Court with jurisdiction under the Tucker Act." Def.'s MSJ at 16.  The government states the Court must dismiss this request for lack of jurisdiction under RCFC 12(b)(1). *Id.* at 1.

## IV.  Analysis

### A.  Interpreting the Text of 26 I.R.C. § 1297

Plaintiffs offer sympathetic equitable arguments regarding areas of potential unfairness in the tax code; this may very well be a policy issue Congress wishes to address.  This Court, however, possesses limited jurisdiction, and it has no jurisdiction over claims for equitable relief under the Tucker Act, despite the forcefulness of plaintiffs' arguments.  *See Brown v. United States,* 105 F.3d 621, 624 (Fed. Cir. 1997).  As Dean John F. Manning[5] explains, the Framers rejected the English doctrine of "the equity of the statute" whereby "English judges had often extended statutes beyond their plain terms in order to make them more coherent expressions of purpose, and cut back others to avoid inequitable results that did not serve the statutory purpose." John F. Manning, *Textualism and the Equity of the Statute*, 101 Colum. L. Rev. 1, 8 (2001). Manning notes "the U.S. Constitution self-consciously separated the judicial from the legislative power and, in so doing, sought to differentiate sharply the functions performed by these two distinct branches." *Id.* at 57.  This "separation of powers had long been associated with the objective of limiting official discretion and promoting the rule of law." *Id.*  As the Supreme Court held, "[w]hatever merits these and other policy arguments may have, it is not the province of [courts] to rewrite the statute to accommodate them.  We hold as we do because [one party's] view seems to us the only permissible interpretation of the text—which may, for all we know, have slighted policy concerns on one or the other side of the issue as part of the legislative compromise that enabled the law to be enacted." *Artuz v. Bennett*, 531 U.S. 4, 10, (2000). Where "the statutory language is clear, there is no need to reach . . . arguments based on statutory purpose [or] legislative history . . . ." *Boyle*, 556 U.S. at 950.  When a court ascertains a "straightforward statutory command, there is no reason to resort to legislative history." *United States v. Gonzales*, 520 U.S. 1, 6 (1997).  While there are times the result of a statute may seem unfair, "[t]he fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning." *Union Bank v. Wolas*, 502 U.S. 151, 158 (1991).  "What is of paramount importance is that Congress be able to legislate against a background of clear interpretive rules, so that it may know the effect of the language it adopts." *Finley v. United States*, 490 U.S. 545, 556 (1989).

---

[5] Morgan and Helen Chu Dean and Professor of Law at Harvard Law School.

According to the Supreme Court, when a statute is unambiguous, courts "should prefer the plain meaning since that approach respects the words of Congress.  In this manner [courts] avoid the pitfalls that plague too quick a turn to the more controversial realm of legislative history."  *Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004); *see also United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989), (quoting *Caminetti v. United States,* 242 U.S. 470, 485 (1917)) ("[W]here, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'").  Plaintiffs ask the Court to interpret the PFIC regime to "only be administered to targets *that match the original intent of Congress* when they [sic] designed the regime."  Pls.' Reply at 2.[6]  Professor Caleb Nelson[7] explains such "intentionalist" approaches "ask [courts] to infer exceptions to a statutory provision when, in the [courts'] judgment, application of the provision would not serve the enacting legislature's apparent goals."  Caleb Nelson, *What Is Textualism?*, 91 Va. L. Rev. 347, 400 (2005).  Courts willing to interpret a statute's clear, exceptionless rule as instead providing a loose standard based on the "legislature's apparent goals" stray beyond "the categories identified on the face of the statute . . . [and] are asserting authority to make their own determinations about how Congress's underlying purposes play out in the case at hand."  *Id.*  Reasonable intentionalists admit some limits to their approach:  "When it is clear that the enacting legislature really meant its directives to be just as rule-like as they seem, intentionalists too would bow to the legislature's decision."  *Id.* at 401.

Judges left unrestrained by the text of an unambiguous statute "are likely to err on the side of reading statutes to give the judiciary more discretionary power than Congress intended," so "the courts' background principles of interpretation should be set in such a way as to offset this expected bias."  *Id.* at 402 (crediting the textualist argument "when Congress has chosen to formulate a directive in relatively rule-like terms, courts should not systematically assume that Congress nonetheless wants to leave room for courts to make the sorts of decisions that standards require.").  The judiciary's "unwillingness to soften the import of Congress' chosen words even if [a court] believe[s] the words lead to a harsh outcome is longstanding.  It results from deference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill."  *Lamie*, 540 U.S. at 538 (internal quotation marks omitted).

In a tax case where a party asked the Supreme Court to avoid applying the plain meaning of a provision of the tax code, the Supreme Court held:  "[j]udicial perception that a particular result would be unreasonable may enter into the construction of ambiguous provisions, but cannot justify disregard of what Congress has plainly and intentionally provided."  *Comm'r v. Asphalt Prod. Co.*, 482 U.S. 117, 121 (1987).  As then Professor Amy Coney Barrett explains, "the principle of legislative supremacy restrains federal courts from expanding and contracting unambiguous statutes to account for diffuse social values," and "[j]udges who depart from the most textually plausible interpretation of statutory language function as something other than

---

[6] Plaintiffs request the Court follow Congress's intent by adopting a "purposive approach" to interpreting the statute.  Pls.' Reply at 5; OA Tr. at 11:20–22 ("This is a question of textual interpretation versus [purposive] interpretation.").  "Purposivism . . . claims that a judge should be faithful to Congress's presumed intent rather than to the statutory text when the two appear to diverge.  Textualism, by contrast, maintains that the statutory text is the only reliable indication of congressional intent."  *See* Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 112 (2010).

[7] Emerson G. Spies Distinguished Professor of Law at the University of Virginia School of Law and author of a leading casebook on statutory interpretation.

faithful agents of Congress."  Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 116, 124 (2010).  In considering whether the text of a statute is clear or ambiguous, "the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.  It demonstrates breadth."  *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (internal quotation marks omitted).  The Federal Circuit explained in a tax case, "[a]s the Supreme Court has repeatedly recognized, '[c]ourts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement.'"  *Travelers Ins. Co. v. United States*, 303 F.3d 1373, 1381 (Fed. Cir. 2002), *on reh'g in part*, 319 F.3d 1380 (Fed. Cir. 2003); *Badaracco v. Comm'r*, 464 U.S. 386, 398 (1984).  Instead, the Federal Circuit requires this Court to "support [its holdings] in the language of the statute."  *Travelers Ins. Co.*, 303 F.3d at 1383–84.

### 1.  The Plain Meaning of § 1297 in Context

Plaintiffs assert they "have never agreed that Enshnierco and everything it owns meet the statutory requirements for a PFIC, because the Plaintiffs contend that context must be factored into the interpretation of the statute."  Pls.' Cross-MSJ at 5.[8]  At oral argument, plaintiffs argued the statute when read in context dictates the Court should not treat their companies as PFICs and thus plaintiffs should not be subject to taxation.  OA Tr. at 53:9–15 ("[T]there are many laws where . . . we do not take it out of its context in interpreting it.").  Plaintiffs further explain despite "the fact that the words of the PFIC statutes within the Tax Reform Act of 1986, omit the context, the Plaintiffs feel that the context was clear at its inception, . . . and it was not necessary [to include] because it *goes without saying*."  Pls.' Reply at 3 (emphasis in original).

Plaintiffs argue a publication from the JCT, JCS-10-87, provides "clearly defined context" outside which § 1297 "cannot be applied."  Pls.' Cross-MSJ at 2.  Plaintiffs state this context demonstrates "the PFIC regime was created to discourage American investors to hold passive investments through foreign corporations that would allow them certain advantages."  *Id.*  Plaintiffs further explain this means the statute includes a willfulness requirement, which plaintiffs fall outside of.  *Id.* at 3.

"To ascertain whether Congress had an intention on the precise question at issue, we employ the 'traditional tools of statutory construction.'"  *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998).  Accordingly, courts "resist reading words or elements into a statute that do not appear on its face."  *Bates v. United States*, 522 U.S. 23, 29 (1997); *see Cox v. West*, 149 F.3d 1360, 1363 (Fed. Cir. 1998) (quoting *Freytag v. Comm'r*, 501 U.S. 868, 873 (1991)) ("[W]hen [a court finds] the terms of a statute unambiguous, judicial inquiry should be complete except in rare and exceptional circumstances.").  Prescribed by the Supreme Court, "the starting point for interpreting a statute is the language of the statute itself.  Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as

---

[8] The statute unambiguously states a PFIC "means any foreign corporation if—(1) 75 percent or more of the gross income of such corporation for the taxable year is passive income, or (2) The average percentage of assets (as determined in accordance with subsection (e)) held by such corporation during the taxable years which produce passive income or which are held for the production of passive income is at least 50 percent."  26 I.R.C. § 1297(a).  Under § 1297(b), passive income is "any income which is of a kind which would be foreign personal holding company income" as defined in § 954(c), subject to certain exceptions not relevant to this case.

conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108 (1980). While the Court may look to context to understand the meaning of a statute, it does not look beyond "the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). Plaintiffs agree interpreting the text in context involves finding an interpretation "consistent with the language of the whole statute . . . ." *See* Pls.' Cross-MSJ at 3–4 (quoting Frederick J. de Sloovere, *Contextual Interpretation of Statutes*, 5 Fordham L. Rev. 219, 230 (1936)).

Plaintiffs ask the Court to search far beyond "the language and design of the statute as a whole" to determine the context of § 1297. *K Mart Corp.*, 486 U.S. at 291; *see* Pls.' Cross-MSJ at 6 ("The Plaintiffs argue that applying the regime outside its context as described in Publication JCS-10-87 and the June 25, 2015 Congressional Record, is contrary to the will of Congress . . . ."). As another judge on this court explained, "in a refund suit, the assessment made by the Service is presumed to be correct and this places an obligation on the taxpayer to come forward with evidence to rebut the presumption." *Cook v. United States*, 46 Fed. Cl. 110, 113 (2000) (Allegra, J.) (citing *United States v. Janis*, 428 U.S. 433, 440–41 (1976)). The plain meaning of § 1297 is unambiguous, and plaintiffs even agree with the government "that Enshnierco as well as Metropolitan Equities Limited are PFICs as defined in Section 1297." OA Tr. at 23:14–17. At oral argument Mr. Shnier conceded "the actual statute does not" require willful intent for a company to be considered a PFIC. OA Tr. at 24:7–11. The Court agrees with plaintiff the plain language of the statute does not require plaintiffs' ownership in a PFIC to be "willful" for the company to be considered a PFIC, and such inquiry exhausts the Court's analysis of "the language and design of the statute as a whole." *K Mart Corp.*, 486 U.S. at 291. The Court holds the government is correct in applying the unambiguous plain text of § 1297 to plaintiffs. *See Cox v. West*, 149 F.3d 1360, 1363 (Fed. Cir. 1998) (quoting *Freytag*, 501 U.S. at 873) ("[W]hen [a court finds] the terms of a statute unambiguous, judicial inquiry should be complete except in rare and exceptional circumstances.").

### 2. Whether the Court May Look Outside the Unambiguous Text for Congressional Intent to Create a Willfulness Requirement

Plaintiffs' argument regarding context may alternatively be read as a request for the Court to apply congressional intent to override the text of the statute Congress enacted. *See* Pls.' Reply at 2, 4 ("the interpretation of the PFIC statutes requires a purposive approach" to incorporate the "Congressional intent explicitly documented in publication JCS-10-87"). The government argues JCS-10-87 "is not legislative history" because it "is a staff-written document that was not prepared by a standing legislative committee." Def.'s MSJ at 12.[9] The government observes although "plaintiffs appear to argue that the assessments of tax against them were inequitable, based on their assertions that their ownership was 'non-willful' and not in line with Congressional intent," the plain language of the PFIC "statutory provisions contains no element of willfulness." *Id.* at 11–12. The government notes "plaintiffs ask this Court to make a

---

[9] *See Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) ("[S]ubsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress.") (internal quotation marks omitted). While the government's characterization is harsh, Professor Caleb Nelson observes "virtually everyone has unkind words for what is sometimes called 'post-enactment legislative history'—statements made in committee reports or floor debates about the meaning of previously enacted statutes." Caleb Nelson, *Statutory Interpretation* 364 (2011).

distinction that Congress did not make—to rewrite the statute by inserting their desired language." Def.'s Amended Resp. at 3.  Plaintiffs respond "cited passages [from the Joint Committee] most certainly show willful intent" should be read into the law.  Pls.' Reply at 3.

As Senior Judge Diarmuid F. O'Scannlain of the Ninth Circuit warns, judges "are not enlightened philosopher-kings, and we are certainly not congressmen."  Diarmuid F. O'Scannlain, *We Are All Textualists Now*, 2 St. John's L. Rev. 303, 313 (2017).  This Court must follow the Federal Circuit's direction regarding the intent of Congress:  "Because a statute's text is Congress's final expression of its intent, if the text answers the question, that is the end of the matter." *Timex V.I., Inc.*, 157 F.3d at 882.[10]  "[The statute's] language is plain and unambiguous. What [one party] asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the judicial function."  *W. Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101 (1991).  Courts only consider looking to legislative history when a statute is vague or ambiguous. *Sebelius v. Cloer*, 569 U.S. 369, 380, (2013) (holding a court's "inquiry ceases [in a statutory construction case] if the statutory language is unambiguous and the statutory scheme is coherent and consistent") (bracketed text in original) (internal quotation marks omitted).

The Supreme Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).  This means courts "are not at liberty to create an exception where Congress has declined to do so." *Freytag*, 501 U.S. 868, 874.  The "possible existence of a few outlier instances does not prove [an] interpretation is absurd.  Congress may well have accepted such anomalies as the price of a uniform system of federal procedure." *Shady Grove Orthopedic Assoc. v. Allstate Ins. Co.*, 559 U.S. 393, 414 n.13 (2010).

Plaintiffs ask the Court to look to legislative history to determine the meaning of the statute, but because plaintiffs agree "the text answers the question, that is the end of the matter." *Timex V.I., Inc.*, 157 F.3d at 882; *see* OA Tr. at 23:14–17 (Mr. Shnier agreeing with the government "Enshnierco as well as Metropolitan Equities Limited are PFICs as defined in Section 1297.").  Plaintiffs themselves cite a law review article from 1936 which demonstrates the longstanding nature of this rule:  "There can therefore be no departure from the plain meaning of a statute in any case, if 'plain meaning' signifies the only sensible meaning (consistent with the meaning of the whole statute) that the words will bear . . ." because "any social interest in the equitable interpretation of the statute is negatived by the explicit legislative command."  de Sloovere, *Contextual Interpretation of Statutes*, *supra*, at 232–33.  The Court holds the plain meaning of § 1297 "is Congress's final expression of its intent, [and because] the text answers the question, that is the end of the matter." *Timex V.I., Inc.*, 157 F.3d at 882.

---

[10] Judge Frank H. Easterbrook of the Seventh Circuit has discussed this principle extensively.  *See NBD Bank v. Bennett*, 67 F.3d 629, 633 (7th Cir. 1995) ("It does not matter what Congress intended in the abstract; the question is what it meant by what it enacted."); *Livingston Rebuild Ctr. v. R.R. Ret. Bd.*, 970 F.2d 295, 298 (7th Cir. 1992) ("Of course, Congress does not enact 'intents' . . . ; it enacts texts, which may differ from the expectations of the sponsors."); *Cont'l Can Co. v. Chi. Truck Drivers*, 916 F.2d 1154, 1157 (7th Cir. 1990) (Easterbrook, J.) ("The text of the statute, and not the private intent of the legislators, is the law.  Only the text survived the complex process for proposing, amending, adopting, and obtaining the President's signature (or two-thirds of each house).").

### 3.  Whether the Taxpayer Bill of Rights Provides Additional Context for Interpreting § 1297

Plaintiffs argue the TBOR provides substantive rights against which the tax code must be interpreted.  Pls.' Cross-MSJ at 13–16 (arguing "the Defendant has violated several of the Tax Payer Bill of Rights [sic]"); *see* I.R.C. § 7803(a)(3) ("In discharging his duties, the Commissioner shall ensure that employees of the Internal Revenue Service are familiar with and act in accord with taxpayer rights as afforded by other provisions of this title, including [a list of ten rights].").  The substantive rights plaintiffs allege the government violated include the right to be informed by the federal government regarding American tax laws, the right to quality service from the IRS for tax-related questions by nonprofessionals, the right not to be discriminated against, and the right to a fair and just tax system.  Pls.' Cross-MSJ at 13–16.  Plaintiffs also argue the application of the PFIC regime to them violates an additional TBOR principle:  "[t]he IRS is committed to ensuring that your civil rights are also protected.  Taxpayers are not subjected to discrimination based on race, color, national origin, [and other protected groups]." *Id.* at 15.  Plaintiffs argue the government's application of the PFIC regime to them discriminates against them based on their national origin because had plaintiffs' "legacy been American and not Canadian, [their] tax treatment would have been much simpler and less harsh."  *Id.*

Plaintiffs admitted they are unaware of any instance where a court has held the TBOR trumps other parts of the Internal Revenue Code.  OA Tr. at 50:2–8.  They argue instead the TBOR provides additional context to interpreting the words of § 1297.  *Id.* at 50:8–19.  As discussed *supra* IV.A.1., the Court should interpret § 1297 within the context of the statutory scheme of the tax code.  This means the Court must investigate whether the TBOR provides substantive legal rights to taxpayers against which § 1297 must be interpreted.  *See id.* at 50:15–19 (Mr. Shnier arguing "apply[ing] the PFIC regime" outside of the context of the TBOR "violat[es], ipso facto, the Taxpayer[] Bill of Rights").

Another judge on this court recently held "[i]t is plaintiff's burden to establish jurisdiction for his claims founded on the Taxpayer Bill of Rights, but he has not shown that the ten rights listed at I.R.C. § 7803(a)(3) are money-mandating so as [to] support this court's jurisdiction under the Tucker Act."  *Yates v. United States*, No. 20-169T, 2020 WL 5587366, at *6 (Fed. Cl. Sept. 18, 2020) (Sweeney, J.).  The court in *Yates* explained the TBOR protects "taxpayer rights *as afforded by other provisions of this title*."  *Id.* (emphasis in original) (quoting I.R.C. § 7803(a)(3)); *see Facebook, Inc. v. IRS*, No. 17-CV-06490, 2018 WL 2215743, at *13 (N.D. Cal. May 14, 2018)) (holding the ten rights listed in the TBOR create no new rights enforceable against the IRS).  In *Moya v. Comm'r*, the Tax Court explained the TBOR exists "not [to] . . . create new rights *or remedies*, only to group existing rights into categories that are easier for taxpayers and IRS employees to understand and remember.  Thus, a TBOR does not create new rights, but provides organizing principles—a framework—for statutory rights."  152 T.C. 182, 196 (2019) (emphasis in original) (internal citations omitted).

Mr. Shnier agreed at oral argument the TBOR does not supplant § 1297 and the rest of the tax code:  "if the Code is 100 percent clear, then I don't think a Taxpayer[] Bill of Rights . . . will address it . . . ."  OA Tr. at 49:13–17.  The only exception Mr. Shnier argued the TBOR

required is when the tax code "is both 100 percent clear and 100 percent discriminatory." *Id.* As this court held in *Yates*, the TBOR does not provide any new rights, but merely protects "taxpayer rights *as afforded by other provisions of this title*." *Yates*, 2020 WL 5587366, at *6. The government explains the PFIC statute treats plaintiffs no differently than any other taxpayer in this country because it merely "ensure[s] that a U.S. taxpayer reports passive income from foreign corporations described in § 1297." Def.'s Amended Resp. at 7. Section 1297 is therefore not discriminatory in this context, meaning under plaintiffs' approach, the TBOR should not override § 1297.

The Court finds the reasoning from the courts in *Yates*, *Facebook, Inc.*, and *Moya* persuasive; even plaintiff agrees the TBOR does not override the text of the tax code. OA Tr. at 49:13–17; *see Yates*, 2020 WL 5587366, at *6; *Facebook*, 2018 WL 2215743, at *13; *Moya v. Comm'r*, 152 T.C. at 196. Despite the forcefulness of the equitable concerns plaintiffs raise, the Court holds it does not have the power to interpret or apply § 1291 contrary to the plain text of the statute as established *supra* at IV.A.1. *See Yates*, 2020 WL 5587366, at *6.

The Court denies plaintiffs' claims for relief under plaintiffs' various interpretations of § 1297 of the tax code. The Court's inquiry into the meaning of the statute ends when the plain meaning of the text is clear, despite the fairness considerations plaintiffs raise. *Boyle v. United States*, 556 U.S. 938, 950 (2009) (where "the statutory language is clear, there is no need to reach . . . arguments based on statutory purpose [or] legislative history"). Plaintiffs offer several additional requests for relief, which the Court now considers.

## B. Additional Requests for Relief

### 1. Whether Tax Treaties Provide an Exemption for Plaintiffs

Plaintiffs assert the IRS has "arguably[] violated tax-treaties between Canada and the United States that would only view Canadian dividend income as taxable less Canadian taxes paid on the 'NR4' Canadian issued tax-slip, and not based on un-realized income, not requiring the complex IRS tax-form '8621.'" Compl. at 2. The tax code allows taxpayers to "take[] the position that a treaty of the United States overrules (or otherwise modifies) an internal revenue law of the United States." 26 I.R.C. § 6114(a). In such a circumstance, the taxpayer "shall disclose (in such manner as the Secretary may prescribe) such position" (1) on the tax return or (2) if no tax return must be filed, in another form the Secretary may prescribe. 26 I.R.C. § 6114(a)(1)–(2). The United States and Canada are parties to the Convention Between the United States of America and Canada with Respect to Taxes on Income and Capital, Sept. 26, 1980, U.S.–Can., T.I.A.S. No. 11,087. The government explains "[u]nder § 6114, in order to take the position that a treaty of the United States overrules or modifies an internal revenue law of the United States, a taxpayer must disclose the treaty-based position on a tax return or statement attached to a tax return." Def.'s MSJ (citing 26 I.R.C. § 6114(a)(1)). The government notes "plaintiffs have not clearly identified any conflict between the [relevant American–Canadian tax treaty] and the PFIC provisions of the Code," but "[e]ven if they had, however, the plaintiffs did not disclose a treaty-based return position on their tax returns, as required by I.R.C. § 6114." *Id.* at 14. The government concludes this means "plaintiffs cannot now contend that they do not owe the tax they reported based on the Treaty." *Id.*

- 19 -

Plaintiffs have not clearly identified any conflict between the Convention Between the United States of America and Canada with Respect to Taxes on Income and Capital and the PFIC provisions of the tax code.  Even if they had identified a conflict, however, plaintiffs did not disclose a treaty-based return position on their tax returns as § 6114 requires.  Plaintiffs' argument fails to build on their assertion the IRS "arguably[] violated tax treaties . . . ." Compl. at 2.  Plaintiffs' subsequent briefing abandoned their treaty-based argument.  *See generally*, Pls.' Cross-MSJ; Pls.' Reply (lacking any discussion of the complaint's treaty-based argument and failing to respond to the government's arguments).  Plaintiffs failed the requirement to disclose a treaty-based return position on their tax returns and did not attempt to cure this omission in their briefing; the Court therefore denies plaintiffs' claim for relief based on tax treaties between the United States and Canada.  *See* 26 I.R.C. § 6114(a)(1)–(2).

### 2.   Whether the IRS Must Desist Classifying Certain Companies as PFICs

Plaintiffs "want the Court to rule that the PFIC statutes does [sic] not support the Defendant's broad application," which would result in the government "desist[ing] from treating Enshnierco and everything it owns, as a PFIC" and taxing the distribution income as if it were from "a normal foreign corporation." Pls.' Reply at 6; Pls.' Cross-MSJ at 17.  The Anti-Injunction Act "flatly prohibits" the grant of injunctive relief in IRS collection proceedings. *Ledford v. United States,* 297 F.3d 1378, 1381 (Fed. Cir. 2002) ("[N]o statutory authority exists that would grant the Court of Federal Claims the power to enjoin an IRS collection proceeding.").  This Court possesses limited jurisdiction under the Tucker Act, and it has no jurisdiction over claims for equitable relief like plaintiffs' request for injunction here.  *See Brown v. United States,* 105 F.3d at 624.  Rule 12(b)(1) requires the Court to dismiss any request outside its jurisdiction.  The Court accordingly dismisses plaintiffs' request for injunctive relief for lack of subject matter jurisdiction.  *Ledford,* 297 F.3d at 1381; *see Matthews v. United States*, 72 Fed. Cl. 274, 278 (2006) ("If the court finds that it lacks jurisdiction over the subject matter, it must dismiss the claim.").

### 3.   Plaintiffs' Request for Fees

Plaintiffs request the Court "reward [them] for half the[ir] legal and/or accounting fees ($57,536)" if the Court "determines that the Defendant has miss-applied to PFIC regime against the Plaintiffs [sic]." Pls.' Cross-MSJ at 17.  Plaintiffs do not identify a basis for such an award but "defer that decision to the Court and their familiarity with Court decisions on similar matters." *Id.*  The government argued the Court has no jurisdiction over this request "because the plaintiffs do not identify any money mandating statute that would provide this Court with jurisdiction under the Tucker Act." Def.'s MSJ at 16.  "The Tucker Act . . . is itself only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. . . .  [T]he Act merely confers jurisdiction upon it whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976).  Plaintiffs "bear[] the burden of establishing subject matter jurisdiction by a preponderance of the evidence." *Reynolds v. Army and Air Force Exchange Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).  Plaintiffs' failure to cite a money-mandating statute to provide this Court with jurisdiction to award plaintiffs 50 percent of their accounting and legal expenses (and the corresponding lack of such a

statute) therefore means their request would fail even if they were the prevailing party in this case.  *Id.*  The Court accordingly dismisses plaintiffs' request for fees for lack of subject matter jurisdiction.  *Id.*; *see Matthews*, 72 Fed. Cl. at 278 ("If the court finds that it lacks jurisdiction over the subject matter, it must dismiss the claim.").

## V.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** the government's motion for summary judgment, **DENIES** plaintiffs' cross-motion for summary judgment, and **DISMISSES** plaintiffs' claims for injunctive relief and fees for lack of subject matter jurisdiction under RCFC 12(b)(1). The Clerk of Court is directed to enter judgment in favor of the government.  No costs.

**IT IS SO ORDERED.**

s/ Ryan Holte
Ryan T. Holte
Judge